```
_____
                               :
FRANK LEE,                     :
                               :
         Plaintiff,            :    Civ. No. 17-133 (NLH)(AMD)
                               :
     v.                        :    OPINION
                               :
CUMBERLAND COUNTY, CUMBERLAND, :
COUNTY CORRECTIONAL FACILITY,  :
WARDEN ROBERT BALICKI, OFFICER :
CIMINO, OFFICER LUCIANO,       :
OFFICER CARTER, OFFICER T.     :
BROWN, OFFICER A. BROWN,       :
OFFICER ROSCOE, OFFICER FLOYD, :
OFFICER RAMIREZ, SERGENT       :
ROBERT MENDIBLES, and JOHN     :
DOE CORRECTIONAL OFFICERS 1-10 :
                               :
         Defendants.           :
_____:
```

APPEARANCES:

Conrad J. Benedetto, Esq.
Law Offices of Conrad J. Benedetto
1233 Haddonfield-Berlin Road
Voorhees, NJ 08043
     and
Frank Rocco Schirripa, Esq.
John Anthony Blyth, Esq.
Hach Rose Schirripa & Cheverie LLP
185 Madison Avenue
14th Floor
New York, NY 10016

     Counsel for Plaintiff

Shanna McCain, Esq.
Chance & McCain LLC
201 West Commerce Street
Bridgeton, NJ 08302

     Counsel for Defendants Cumberland County, Cumberland County
     Correctional Facility, and Warden Robert Balicki

Justin Robert White, Esq.
Testa Heck Testa & White, PA
424 W. Landis Avenue
Vineland, NJ 08360

Counsel for the Individual Corrections Officer Defendants


HILLMAN, District Judge

This case concerns an assault that Plaintiff Frank Lee, an

inmate formerly incarcerated at Cumberland County Correctional

Facility in Bridgeton, New Jersey, suffered at the hands of

other inmates within his cell block.  In the Complaint,

Plaintiff alleges that the correctional officer defendants on

duty during the assault were deliberately indifferent to

Plaintiff in failing to intervene and failing to provide medical

care in violation of the Eighth Amendment; conspired to deprive

Plaintiff of his constitutional rights pursuant to 42 U.S.C. §

1985, and violated common law conspiracy and the New Jersey

Civil Rights Act.  The Complaint also asserts a Monell claim

against Cumberland County and Warden Robert Balicki.

At issue are Defendants' Motions for Summary Judgment,

which are ripe for adjudication.  See ECF Nos. 61 (County

Motion), 62 (Individual Defendants Motion).  The Court has

subject-matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1331, as this case concerns a federal question.  For the

reasons that follow, the Court will grant the Motion.

2

I.   Factual Background

In 2013, Plaintiff, Frank Lee was involved a robbery in
Fairfield Township, New Jersey.  ECF No. 61-3 at 1.  Plaintiff
was eventually arrested and was detained in the Cumberland
County Jail in February of 2014.  Id.  During his time of
incarceration, Plaintiff was a pre-trial detainee awaiting
trial.  Id.  From approximately April 2014 to January 2015, he
was housed in C Block, which is a dormitory with individual
cells.  Id.  C Block consists of a day room in the middle with
cells on either side.  Id.  Plaintiff did not like the
"atmosphere of C Block."  Id.  Specifically, he did not like
that his cell block was populated by "youth" and "wild" guys.
Id. at 2.  The residents of C Block also tended to be "cliquey,"
but he was not part of any clique.  Id.  There are no guards in
C Block, which is supervised indirectly.  Id.

According to his testimony, Plaintiff claims that he had no
problem with any of the other residents of C Block while he was
housed there prior to the assault.  Id.  He described his
relationship with the other inmates of the block as "mutual"
which means that "there's no positive and no negative."  Id.
Plaintiff admitted at his deposition that to his knowledge, no
corrections officers or jail staff ever observed issues between
him and other inmates in C Block.  Id.  Plaintiff admitted at
deposition that prior to the assault, no one said anything to

3

make him concerned and he did not say anything that would make any other inmate upset. Id. Plaintiff testified that in the weeks or days before the assault he never told anyone at the jail anything about the other inmates in C Block, nor made complaints about the other inmates in C Block and testified that he was not afraid of the inmates in C Block. Id. Plaintiff also admitted that he did not have a problem with any of the corrections officers at the jail. Id.

On the day of the attack, Plaintiff was playing a card game with Obidiah Taylor, Cornell Tarte and Troy Domini. Id. He testified that "as we were playing cards it just felt awkward" and his partner, "he played disinterested." Id. He said that he felt "boxed in" during the game so he stood up, and "the game wasn't like it normally was, we all just quit." Id. He testified that he felt vulnerable at that moment, but he didn't tell anyone that because he felt "there was no reason to." Id. Lee testified that after the card game another inmate "splash[ed"] him with hot water from behind." Id. He was not sure who did this. Id. Plaintiff testified that someone then took a swing at him but missed. He was unsure who swung at him. Id.

During this time, he said that CO Cimino was somewhere in the vicinity "down the hall." Id. at 4. Plaintiff testified that CO Cimino could see inside C Block and that he "looked

4

directly at him and waving my hand," but Cimino did not
intervene.  Id.  Lee testified that the time between him waiving
at CO Cimino and the rest of the attack was "maybe about five
seconds."  Id.  He testified that he believed that CO Cimino was
under the misimpression that the activity in C Block was just
horseplay between inmates.  Id.

CCTV video footage captured the inside of C Block from the
outside of C Block's gate beginning at 9:30:30.  Id.  Per
Plaintiff's testimony he had already been splashed with water by
the time he can be seen in the video at 9:31:27.  Id.  In the
CCTV video of this incident, Plaintiff is walking around the
cell block following the attempted "splashing" and attempted
punch at 9:31:27.  Id.  Per Plaintiff's testimony he believes he
waved down CO Cimino after the hot water was splashed sometime
before 9:31:27, and certainly in the approximately two-minute
time frame between 9:30:30 and 9:32:33.  Id.  Plaintiff stated
that he was trying to figure out what was going on at frame
9:31:53.  Id.  On the CCTV video, Plaintiff can be seen
communicating with the other inmates trying to determine what is
happening at 9:31:53.  Id.  In the video, he is then punched in
the back of his head by another inmate believed to be Cornell
Tarte at 9:32:33.  Id.  Per the video and Plaintiff's testimony,
the fight ensues after inmate Tarte's punch in the back of the

head.  Id.  Per the CCTV video, the inmates start retreating to their cells at 9:33:08.  Id.

Per Plaintiff's testimony and the CCTV footage, CO Cimino appears at the gate outside of C Block at 9:33:26.  Id. Plaintiff agrees that the inmates begin going back into their cells at 9:33:49.  Id.  In the CCTV video, Tarte and Plaintiff then wrestle and Plaintiff goes to the ground.  Id. at 5.  Most of the other inmates then join the fight and punch and kick Plaintiff.  Id.  Plaintiff testified that "I didn't hear anything while I was on the ground. I just covered myself up. But I did see officers at the gate. I didn't hear them say anything, so no."  Id.

Plaintiff stated that CO Cimino responded and began shooting pepper spray into the cell block.  Id.  Plaintiff stated that he "didn't realize until, like the blows weren't as many as they were before, that at some point after the CO's were at the gate that some of the inmates had gone back into their cells."  Id.  On the CCTV video, Officer Cimino can first be seen, after pepper spraying the inmates in C Block, at 9:33:26. Id.  Sergeant Mendibles can also be seen responding and looking into the cell block at 9:33:59.  Id.  CO Cimino authored a subject/witness record form at 9:40 p.m. memorializing that he observed the whole block "jumped on Frank Lee. I began to pepper spray all inmates involved in the fight. I, Officer Cimino

handcuffed inmate Obadiah Taylor." Id. From the CCTV video, it appears that all of the inmates were suffering from the effects of the pepper spray at 9:33:16. Id. However, it can be seen from the CCTV video that Obadiah Taylor and Troy Donini continued to punch and beat him. Id.

The Cumberland County Jail Supervisors' Reports from January 9, 2015, reflect that the code was called for this event in C Block occurred at 9:35 p.m., that the medical department at the jail determined that Plaintiff would need to be transported to the hospital at 9:45 p.m., and that Lee was "TOT [turned over to] Inspira Hospital" at 9:55 p.m. Id. Reports were authored by the following CO's at the following times: CO's Luciano (9:40 p.m.); Ramirez (9:30 p.m.); Rittilies (9:30 p.m.); Hill (9:39 p.m.); T. Brown (9:40 p.m.); Roscoe (9:40 p.m.); Reichner (9:36 p.m.); Crawford (9:36 p.m.); J. Brown (9:40 p.m.); Carter (9:36 p.m.); Mendibles (10:00 p.m.); Cimino (9:40 p.m.); Floyd (9:40 p.m.).[1] Id. at 6.

---

[1] The Court notes that the reports of Officers Ramirez and Rittilies appear to be written at 9:30 p.m., which would be before the assault on Plaintiff. The "Incident/Offense Report" provides sections for the officer to fill in both the "time of incident" as well as the time of report. It may be that these officers "rounded" to the nearest half hour or simply included 9:30 for both entries given the lapse of only minutes between when the assault occurred and when the other reports were filled out. This discrepancy, while unexplained, is not material to the issue of exhaustion.

An employee of CFG, the jail's in-house medical provider, completed their "Off-Site Emergency Health Services Form" for Lee's emergency room visit to Inspira Hospital at 10:00 p.m. on January 9, 2015, for a left eyebrow laceration and left eye swelling. Id. Progress notes completed by CFG at 10:30 p.m. indicate that before Plaintiff went to Inspira his laceration was covered and head wrapped at the jail. Id. Physician's orders from these same jail records reflect a note at 10:30 p.m. that Plaintiff was seen by Dr. Pettis and Nurse Sosa and was "sen[t] via custody to Inspira-Vineland." Id. Per CFG's records, after arriving at the jail's infirmary, Plaintiff was sent almost immediately to the hospital. Id.

Plaintiff testified and the medical records support that he first went to a local hospital, Inspira Hospital, and then onto Cooper in Camden where he was treated for his left orbit fractures and head injury. Id. At the hospital, he received stitches and medication for pain and he was returned to the hospital to have his stitches removed. Id.

After returning to the jail from the hospital, Plaintiff was moved to a new cell block where the jail tried to keep him apart from the C Block. Id. at 6-7. After Plaintiff returned to the jail, he continued to get medical care from the jail's medical provider, CFG, who is not a party to this lawsuit. Id. at 7.

Plaintiff testified and interviews conducted by Internal Affairs at the Jail confirmed that Plaintiff did not want to press any charges against his attackers. Id. Per Plaintiff's own testimony, the jail staff did take measure to prevent Plaintiff from coming into contact with them in the future. Id. He confirmed at his deposition that he is not claiming that he was ever subjected to any excessive force by any CO. Id. Plaintiff testified that he believes that the fact that the jail allows the inmates access to hot pots, which he called "stingers" is a policy which caused his injury, since he testified to his belief that they were no longer allowed in state prison. Id. Despite Plaintiff's testimony that he had suffered burns, Cooper Hospital records reflect that Plaintiff was not treated for any burn related injury. Id. Plaintiff testified that he was not making any claim that the jail was deliberately indifferent to the medical needs of inmates. Id.

At his deposition, Plaintiff stated that he may have "thanked" CO Cimino for saving his life in light of CO Cimino's actions during the attack. Id. at 3. He repeatedly confirmed that he had no reason to believe that any CO knew that an attack was imminent. Id. He was asked about the rumor that he talked about having a sexual relationship with another inmate's mother. He conceded that he too has heard that rumor but denied ever teasing another inmate about having sex with their mother. Id.

He testified that he knew that several shanks were present in C block at the time he was attacked.  Id.  He testified that he wasn't sure who was the owner or owners of the shanks and denied that any were his.  Id.  He admitted at his deposition that despite knowing of the presence of the shanks, he never brought them to the attention of any CO.  Id.

Cumberland County Jail maintains an administrative grievance process which is available to all inmates in the form of an inmate handbook which is attached to Policy 8.1 and given to all inmates upon admission.  ECF No. 62-20.  Per the inmate handbook, the grievance process allows inmates to seek administrative remedies when the inmate has a complaint or grievance.  Id.  The grievance process provides that an inmate can initiate a grievance by submitting a written statement or letter directed to the correctional administrator, which is placed in a sealed envelope and given to any staff member for delivery.  Id.  The correctional administrator then decides on the action to be taken, unless he or she is involved in the grievance, in which case another staff member will review the grievance.  Id.

In the event of a dispute, all sides of the grievance shall be heard and witness statements taken if needed.  Id.  A reply to a grievance will be given no later than five working days after receipt.  Id.  The decision on the grievance will be

written and state the reason for the decision, be based on factual evidence, fairness, and jail policy.  Id.  An inmate may then appeal an unfavorable decision in writing to the correctional administrator explaining the grounds for the appeal.  Id.  The appeal will then be reviewed and a written reply shall be provided.  Id.  In addition, an inmate may request that a grievance be kept confidential.  Id.  The grievance procedure also notes that certain grievances shall be acted on immediately or as soon as practicable.  Id.  These include requests where an inmate's safety is in jeopardy.  Id.  The handbook separately provides that "forms will be provided for inmate requests, special problems or grievances.  Id.  Each such request must be in writing and signed."  Id.  The Cumberland County jail has a specific form called an "administrative remedy form."  ECF No. 19.  Plaintiff signed a receipt of handbook form on February 20, 2014.  ECF No. 21.

Prior to the assault, Plaintiff "maybe questioned or asked" the officers from time to time to be moved to another part of the jail facility because he did not like C Block.  ECF No. 61-4.  He admits that these requests were verbal and made to an unidentified lieutenant and unidentified sergeant.  Id.  He stated that he "may" have put his request for a transfer in writing.  Id.  At no point did Plaintiff testify that any such request raised the issue of his safety.  In fact, Plaintiff

admits that he never made any written complaints about the inmates in C Block and that he never filed a request form to be transferred out of concern of being "jumped."  Id.

Plaintiff also confirmed that he never made a verbal request to staff regarding his safety.  Id.  A search of jail records reveals that no administrative request form for transfer from one part of the jail to another was ever submitted by Plaintiff prior to the assault on him on January 9, 2015, although Plaintiff disputes this to the extent that he "may" have submitted something in writing.  ECF No. 61-3.

During Plaintiff's incarceration at the Cumberland County Jail, that same inmate handbook also provided inmates with a process through which they could request medical attention.  Id. Plaintiff submitted eight inmate medical request forms between the date of his assault, January 9, 2015 and his release from the Jail June 2015.  Id.  According to jail records, Plaintiff saw someone in the medical department 38 times between the date of his assault, January 9, 2015 and his release from the Jail, June 2015, most of which appear to be result of his formal requests for medical care on inmate request forms.  Of the options available on the inmate request form, Plaintiff did not make any types of requests besides "medical/nursing."  Id.

Plaintiff remained in the Cumberland County Jail until June of 2015 when he was able to post a bond.  Id.  After his release

from the Cumberland County Jail, Plaintiff has been continuously incarcerated in various state prisons beginning on September 4, 2015 for N.J.S.A. 2C:18-2A Burglary-Enter Structure and CDS and N.J.S.A. 2C:35-5 CDS/Manufacture, Distribute, Dispense, albeit not in the Cumberland County Jail. When this lawsuit was filed on January 6, 2017, Plaintiff was incarcerated at Northern State Prison. Id.

Plaintiff filed a lawsuit naming Cumberland County, Cumberland County Department of Corrections, Warden Balicki and multiple corrections officers. ECF No. 1. In the statement of facts of his January 6, 2017, Complaint, Plaintiff alleged that he was the "victim of an unprovoked violent street gang-style assault by other inmates housed on C Block." Id. Plaintiff further alleged that "the assault commenced when hot liquid that smelled like chemicals was thrown by an unidentified individual from behind, to the left side of Mr. Lee's head." Id. Plaintiff further alleged that "despite being aware of what was transpiring, the Corrections Officers failed to enter C-Block to assist Frank Lee and prevent the assault." Id. In Count II of the Complaint against Plaintiff further alleged that Cumberland County, Cumberland County Department of Corrections, and Warden Balicki acquiesced to violence against inmates by . . . other inmates." Id. In Count VI of the Complaint against Plaintiff further alleged that Cumberland County, Cumberland County

Department of Corrections, and Warden Balicki "permitted and even facilitated the attack of Plaintiff by allowing the attack to occur while they observed the beating." Id.

During the course of discovery, the Plaintiff, for the first time, through his own deposition testimony on November 21, 2017, and interrogatory questions theorized that the Cumberland County Jail caused his injuries by permitting the use of "stingers" or hot pots in the jail as well as allowed instruments which could be made into shanks or were shanks inside the jail. ECF No. 61-3. Plaintiff continued to develop this theory of liability by requesting, on January 8, 2018, documents setting forth the jail's hot pot policies and other injuries/incidents where a hot pot or stinger was used in connection with an assault on an inmate as well as requesting documentation of incidents involving an inmate's use of a shank on another inmate at the jail. Id. When asked at the time of his deposition other ways that the attack on him could have been prevented, Plaintiff testified that the shank in this case was made from a screw that's supposed to be in a wall, securing shelves to a wall, and that there's "several of them floating around." Plaintiff stated he knew that there were shanks being floated around C Block before he was attacked. Id. He further explained that the shanks are made by unscrewing the screw from the wall securing the shelf and that when one removes the screws

14

from the shelf one can absolutely see that there is a missing
screw because there is a hole in the wall.  Id.

II.  Standard of Review

Summary judgment should be granted when the pleadings,
depositions, answers to interrogatories, admissions on file, and
affidavits show that there is no genuine dispute as to any
material fact and that the moving party is entitled to a
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A disputed
fact is material when it could affect the outcome of the suit
under the governing substantive law.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.  Id. at 250.  The Court should view the
facts in the light most favorable to the non-moving party and
make all reasonable inferences in that party's favor.  Hugh v.
Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

Initially, the moving party must show the absence of a
genuine issue concerning any material fact.  See Celotex Corp.
v. Carrett, 477 U.S. 317, 323 (1986).  Once the moving party has
satisfied its burden, the non-moving party, "must present
affirmative evidence in order to defeat a properly supported
motion for summary judgment."  Anderson, 477 U.S. at 257.
"While the evidence that the non-moving party presents may be
either direct or circumstantial, and need not be as great as a

preponderance, the evidence must be more than a scintilla."

Hugh, 418 F.3d at 267 (citing Anderson, 477 U.S. at 251).

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). Rule 56 mandates the entry of summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

A thorough and comprehensive review of the docket makes clear that no material fact is in dispute as to the dispositive issue in this case.

III. Discussion

    A.   Administrative Exhaustion

In support of the Motion for Summary Judgment, Defendants argue that Plaintiff has failed to file an administrative remedy or grievance regarding the assault and claims in his Complaint. See ECF No. 61-1.[2] Although Plaintiff filed a number of requests

_____

[2] The Court notes that the individual defendants did not specifically seek summary judgment on the issue of failure to exhaust administrative remedies. See ECF No. 62-2. Those defendants generally sought summary judgment based on

16

for medical assistance under the medical assistance procedures in the Handbook, Plaintiff failed to file any administrative grievance with respect to his safety, the assault, or denial of medical care at issue in the Complaint.[3] These facts are not in dispute.

The exhaustion of administrative remedies is a mandatory prerequisite to any prisoner's filing of a civil rights action regarding prison conditions. 42 U.S.C. § 1997e(a); Woodford v. Ngo, 548 U.S. 81, 85 (2006) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)). Specifically, § 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

Plaintiff's failure to state a claim as a matter of law as to the relevant counts in the Complaint; defendants also raised as an affirmative defense in their Answer a failure to state a claim. See ECF No. 21. Because (1) the failure to exhaust is fatal to and precludes all of Plaintiff's claims, (2) the issue was raised and briefed specifically by co-defendants with notice and an opportunity to be heard by Plaintiff, and (3) defendants argue that Plaintiff claims generally fail as a matter of law, the Court finds it in the interest of justice to bar Plaintiff's claims as to all defendants in light of the undisputed material facts.

[3] Plaintiff's requests for medical care are not administrative grievances. They are simply forms that enable an inmate to request a certain type of medical service by checking off which service is needed. These medical request forms do not conform to the procedures regarding administrative grievances in the Handbook.

Exhaustion is a precondition for bringing suit and, as such, it is a "'threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time.'" Small v. Camden County, 728 F.3d 265, 270 (3d Cir. 2013). There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court. Porter v. Nussle, 534 U.S. 516, 524 (2002).

"[T]he . . . exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532.[4] A prisoner must exhaust all available administrative remedies even where the relief sought, such as monetary damages, cannot be granted through the administrative process, as long as the grievance tribunal has authority to take some responsive action. Booth v. Churner, 532 U.S. 731, 741 (2001). A pretrial detainee is not exempt by reason of his pretrial status from the PLRA's exhaustion requirement. United States v. Khan, 540 F. Supp. 2d 344 (E.D.N.Y. 2007).

---

[4] Although exhaustion is most frequently considered in light of the most common federal civil rights claims, § 1983 and Bivens, it applies to "all inmate suits about prison life" including other less frequently alleged claims, such as conspiracy under § 1985. See, e.g., Hershey v. Lanigan, 2012 WL 209430 (D.N.J. Jan. 23, 2012) (dismissing prisoner claims for failure to exhaust including § 1985 conspiracy claim).

The applicable procedural rules for properly exhausting administrative remedies "are defined not by [§ 1997e(a)], but by the prison grievance process itself.  Compliance with prison grievance procedures, therefore, is all that is required by [§ 1997e(a)] to 'properly exhaust.'"  Jones v. Bock, 549 U.S. 199, 218 (2007).  An inmate must "properly exhaust" the available administrative remedies, which means "using all steps that the agency holds out" and "demands compliance with an agency's deadlines and other critical procedural rules."  Woodford v. Ngo, 548 U.S. at 90.

Cumberland County Jail maintains an administrative grievance process which is available to all inmates in the form of an inmate handbook which is attached to Policy 8.1 and given to all inmates upon admission.  Per the inmate handbook, the grievance process allows inmates to seek administrative remedies when the inmate has a complaint or grievance.  The grievance process provides that an inmate can initiate a grievance by submitting a written statement or letter directed to the correctional administrator, which is placed in a sealed envelope and given to any staff member for delivery.  The correctional administrator then decides on the action to be taken, unless he or she is involved in the grievance, in which case another staff member will review the grievance.

In the event of a dispute, all sides of the grievance shall be heard and witness statements taken if needed. A reply to a grievance will be given no later than five working days after receipt. The decision on the grievance will be written and state the reason for the decision, and be based on factual evidence, fairness, and jail policy. An inmate may then appeal an unfavorable decision in writing to the correctional administrator explaining the grounds for the appeal. The appeal will then be reviewed and a written reply shall be provided. In addition, an inmate may request that a grievance be kept confidential. The grievance procedure also notes that certain grievances shall be acted on immediately or as soon as practicable. These include requests where an inmate's safety is in jeopardy. The Handbook separately provides that "forms will be provided for inmate requests, special problems or grievances. Each such request must be in writing and signed." The Cumberland County jail has a specific form called an "administrative remedy form."

Here, the undisputed facts establish that Plaintiff signed a receipt of handbook form on February 20, 2014 and Plaintiff failed to file any administrative remedy as to the assault, his medical care, or his concerns prior to the assault in Cell Block C. Indeed, he admits that he was a prisoner, that the jail had an inmate handbook providing the grievance procedure, that he

was required to file an administrative claim, but that he did not do so. ECF No. 71 at 33. Plaintiff does state in his deposition testimony that he "may" have put something in writing regarding his desire to be transferred from C Block, but Plaintiff is not challenging a lack of transfer in the Complaint. He challenges Defendants' failure to protect him — the operative concern here is his safety not his housing assignment. The undisputed facts demonstrate that Plaintiff failed to file any administrative grievance regarding the issues in the Complaint – his safety, the assault, and his medical care.

Plaintiff argues, however, that the grievance procedure was unavailable to him, an exception to the exhaustion requirement. Id. at 34. Plaintiff asserts that the administrative remedy process at the Jail was a "Dead end" because he because his repeated verbal complaints to guards about his desire to be moved from Block C did not result in a change in his housing assignment.[5]

---

[5] Plaintiff admits in his deposition testimony that he believed he had made some verbal requests to an unidentified lieutenant and an unidentified sergeant about being transferred, but he stated that he could not recall whether he ever put his request in writing. The County Defendants have submitted an affidavit to support their statement of fact that "a search of jail records reveals that no administrative request form for transfer from one part of the jail to another was ever submitted by Plaintiff prior to the assault on him on January 9, 2015." That statement of fact relies on Exhibit O, ECF No. 61-18, which only

In support of his argument, Plaintiff relies on Ross v.
Blake, 136 S. Ct. 1850 (2016), in which the Supreme Court of the
United States reiterated that the sole issue regarding
exhaustion is whether the administrative remedies were
"available" and outlined the three instances in which remedies
would not be "available:" (1) when an administrative procedure
"operates as a simple dead end with officers unable or
consistently unwilling to provide relief to aggrieved inmates;"
(2) where the administrative remedies are so unclear that "no
ordinary prisoner can make sense of what it demands;" and (3)
where prison officials "thwart inmates from taking advantage of
a grievance process through machination, misrepresentation, or
intimidation." Id. at 1859-60. None of these examples take
into account the prisoner's subjective view of the availability
of remedies or whether the remedy system needs to be utilized.

Here, none of the categories apply to Plaintiff given the
undisputed facts. First, there are no facts or disputes of
facts that would demonstrate that the administrative remedy
procedure at the Jail operates as a dead end. Here, Plaintiff
simply failed to utilize it; his argument regarding verbal

---

provides from the affiant that "I searched the jail records and
the logbook for January 9, 2015 cannot be located." It appears
some operative words are missing from the affidavit to support
this statement of fact; however the Court finds any ambiguity
immaterial in light of Plaintiff's admissions.

requests is unavailing because verbal requests are not recognized under the established grievance procedures. Further, Plaintiff demonstrates some knowledge of the Handbook because Plaintiff utilized a similar procedure for requesting medical assistance multiple times and obtained the relief he requested through it. Second, there is simply no evidence to support that the grievance procedure was so unclear as to be unavailable to Plaintiff; in fact, Plaintiff's use and understanding of the medical request forms and related procedure demonstrates that the grievance procedures likely would have been clear to Plaintiff had he availed himself of it. Finally, there are simply no facts that prison officials sought to thwart the use of the grievance system at the jail.

Accordingly, this Court finds that Plaintiff failed to exhaust the administrative remedies that were available to him, as he is required to do by § 1997e(a) prior to filing suit. It will thus grant summary judgment in favor of Defendants and against Plaintiff.

B. <u>John and Jane Doe Defendants</u>

Plaintiff alleges in the Complaint federal claims pursuant to § 1983 against Cumberland County Corrections Officers John Doe Defendants. Despite the close of discovery some months ago, Plaintiff has failed to identify these John or Jane Doe defendants. Because Plaintiff has failed to identify them and

because the time for doing so has since past, the Court must dismiss them without prejudice on its own motion pursuant to Federal Rule of Civil Procedure 21.

Federal Rule of Civil Procedure 21 provides that "on motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. <u>See</u> <u>also</u> <u>Blakeslee v. Clinton County</u>, 336 F. App'x 248, 250 (3d Cir. 2009) (affirming dismissal of Doe defendants pursuant to Rule 21). "Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified. If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed." <u>Id.</u> <u>See</u> <u>also</u> <u>Scheetz v. Morning Call, Inc.</u>, 130 F.R.D. 34, 37 (E.D. Pa. 1990) ("Fictitious parties must eventually be dismissed . . . if discovery yields no identities.").

Plaintiff had well over twelve (12) months of discovery to allow him to identify the individual John and Jane Doe defendants and thereafter to amend the complaint. Plaintiff has failed to do so. As such, the Court must dismiss the John and Jane Doe defendants. <u>See</u> <u>Blakeslee</u>, 336 F. App'x at 250-51; <u>Adams v. City of Camden</u>, 461 F. Supp. 2d 263, 271 (D.N.J. 2006) (holding that, after a reasonable period of discovery has passed, "[i]t is appropriate, before proceeding to trial, to

eliminate [the] fictitious defendants from [an] action under

Fed. R. Civ. P. 21.").

C.   <u>Remaining State Law Claim Claims</u>

Having determined that Plaintiff has failed to raise

genuine issues of material fact on his federal claims under 42

U.S.C. § 1983, the claims which remain present issues of state

constitutional, statutory, and common law, over which this court

may exercise supplemental jurisdiction pursuant to 28 U.S.C. §

1367.[6]  Specifically, Plaintiff asserts claims for common law

conspiracy and violations of the New Jersey Civil Rights Act.

<u>See</u> ECF No. 1.  The Court will exercise its discretion and will

decline to exercise supplemental jurisdiction over these state

law claims.

"The district courts may decline to exercise supplemental

jurisdiction . . . if . . . the district court has dismissed all

claims over which it has original jurisdiction . . . ."  28

U.S.C. § 1367(c)(3).  "The decision to retain or decline

jurisdiction over state-law claims is discretionary" and "should

be based on considerations of judicial economy, convenience and

fairness to the litigants."  <u>Kach v. Hose</u>, 589 F.3d 626, 650 (3d

Cir. 2009).  Additionally, federal courts should be guided by

---

[6] There appears to be no diversity of citizenship between
Plaintiff and the Defendants so jurisdiction under § 1332 cannot
lie independently, separate and apart from the federal claims.

the goal of avoiding "[n]eedless decisions of state law . . .
both as a matter of comity and to promote justice between the
parties." United Mine Workers v. Gibbs, 383 U.S. 715, 726
(1966). Declining to exercise supplemental jurisdiction is
especially warranted when the case calls for interpreting a
state constitution. See Trump Hotels & Casino Resorts, Inc. v.
Mirage Resorts, Inc., 963 F. Supp. 395, 408 (D.N.J. 1997).
Further, the Third Circuit has recognized that where all federal
claims are dismissed before trial, "the district court must
decline to decide the pendent state claims unless considerations
of judicial economy, convenience, and fairness to the parties
provide an affirmative justification for doing so. Hedges v.
Musco, 204 F.3d 109, 123 (3d Cir. 2000) (quoting Borough of W.
Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995)). See
also Charles Alan Wright & Arthur R. Miller, Federal Practice &
Procedure, § 3567.3 (3d ed.) ("As a general matter, a court will
decline supplemental jurisdiction if the underlying [federal
question] claims are dismissed before trial").

Because Plaintiff's remaining claims concern
interpretations of the New Jersey constitutional, statutory, and
common law, and the federal claims have been dismissed before
trial, the prudent course is to decline to exercise supplemental
jurisdiction over those claims. For these reasons, the Court

26

will dismiss Plaintiff's state law claims without prejudice, for lack of jurisdiction, in accordance with 28 U.S.C. § 1367(c)(1).

IV.  Conclusion

The Court will grant Defendants' Motion for Summary Judgment and enter judgment in Defendants' favor and against Plaintiff.  An appropriate order follows.


Dated: August 30, 2019                s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.